UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VAHID BAIGI,<br><br>  Plaintiff,<br><br>  v.<br><br>CHEVRON USA INC., et al.,<br><br>  Defendants. | Case No. 17-cv-06806-SI<br><br>**ORDER DENYING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 40 |

Before the Court is a motion for summary judgment filed by defendants Chevron U.S.A. Inc. and Chevron Shipping Company LLC (collectively "Chevron"). The lawsuit arises out of a knee injury sustained by plaintiff on August 23, 2016 during his duties as Chief Mate on the *Mississippi Voyager* while working for defendants. Pursuant to Civil Local Rule 7-1(b), the Court finds this matter appropriate for resolution without oral argument and VACATES the hearing set for March 22, 2019. The Court DENIES defendants' motion for partial summary judgment.

## BACKGROUND[1]

**I.  Plaintiff Baigi**

Plaintiff is an experienced merchant seaman who has worked on marine transportation vessels for approximately 25 years. Baigi depo 18:6-21; 21:6-20 (Dkt. No. 40-2). In 2001, Mr. Baigi began working for Chevron as an able bodied seaman (an "AB"). *Id*. He has worked for Chevron as an AB, a machinist, and later as Second Mate and Chief Mate. Baigi Depo 20:13-21:7; 25:2-19

---

[1] The following facts are undisputed unless otherwise indicated.

1  (Dkt. No. 40-2). On August 23, 2016 he was Chief Mate of the *Mississippi Voyager* when he sustained the injury underlying the instant action.

## II. The *Mississippi Voyager*

The *Mississippi Voyager* carried petroleum products. Baigi Depo. 79:10-80:8 (Dkt. No. 40-2). Ryan McKenney was the captain of the August 2016 voyage (the "Hawaii/Singapore Voyage"). McKenney Depo 77:3-10 (Dkt. No. 40-2). Pursuant to Chevron policy and US Coast Guard regulations, the *Mississippi Voyager's* captain, Captain McKenney, was responsible for the vessel. McKenney Depo. 40:6-16; 63:5-9 (Dkt. No. 41-1).

## III. Ballast Tank Inspection and Cleaning

The *Mississippi Voyager* had ten ballast tanks in need of inspection and cleaning. Baigi Depo 96:19-24; McKenney Depo 73:3-8 (Dkt. No. 41-1). Each tank has a 60 foot ladder that the inspector must climb down to complete the inspection. Baigi Depo 41:2-15 (Dkt. No. 40-2). The inspections ensure the tanks are safe, i.e., that there is enough oxygen and there are no hydrocarbon leaks that would endanger the cleaning crew. McKenney Depo 77:16-23; 78:3-15 (Dkt. No. 40-3). The tanks can reach high temperatures, especially when adjacent to heated cargo. For example, the ballast tanks, which were adjacent to 140 degree heated cargo, were approximately 120 degrees when Mr. Baigi inspected them. Baigi Depo. 44:22-45:13; 163:7-21 (Dkt No. 40-2).

## IV. Events Prior to the Hawaii/Singapore Voyage: Richmond/Hawaii Voyage

Prior to the Hawaii/Singapore voyage during which Mr. Baigi was injured, several events and decisions took place. First, Mr. Baigi and his co-Chief Mate, Jeremy Meads, agreed that the ballast tank inspection and cleaning would take place during the *Mississippi Voyager*'s trip from Richmond, California to Hawaii (the "Richmond/Hawaii Voyage"). Baigi Dec ¶ 3 (Dkt. No. 41-2). The parties dispute why this decision was made. Mr. Baigi contends that the Richmond/Hawaii Voyage was earlier in the year in cooler sea water and weather than the Hawaii/Singapore Voyage

and the decision was made with Chevron's Heat and Illness Prevention Policy in mind.[2] Baigi Dec ¶ 2 (Dkt. No. 41-2). Defendants contend the decision was made independent of the Heat Illness and Prevention Policy. Dkt. No. 42 at 10-11. The Chief Mates also decided the hydraulic pipe lines would be repaired during the Richmond/Hawaii Voyage, prior to arrival in Hawaii. *Id*.

Both the ballast tank project and the hydraulic pipe line repair were postponed. Baigi Dec ¶ 4 (Dkt. No. 41-2); Meads Depo 32:23-33:2, 33:19-34:14 (Dkt. No. 41-1); McKenney Depo 54:8-55:21, 63:2-24 (Dkt. No. 41-1); Baigi Depo,70:20-71:4 (Dkt. No. 41-1). Mr. Baigi contends this was done because Captain Eaton, who was aboard the Richmond/Hawaii Voyage, was a compliance auditor and had raised safety concerns regarding the ballast tank project. *Id*. In his turnover notes, Chief Mate Meads wrote that the ballast tank inspection/cleaning was postponed to avoid a potential "email shitstorm" from Captain Eaton who had questioned the safety conditions. Bull Declaration Ex. F (Dkt. 41-1). This resulted in the work being added to Mr. Baigi's already long to-do list for the Hawaii/Singapore Voyage. *Id*.

Second, before the *Mississippi Voyager* left Hawaii for Singapore, Chevron shore-side management compiled a to-do list for plaintiff and his crew. The to-do list consisted of work that could have been completed in the Hawaii shipyard. Baigi Depo 83:9-19 (Dkt. No. 40-2). Chevron initially assigned a "safety-mate" to accompany the crew on the Hawaii/Singapore voyage, but the office cancelled the assignment at the last minute. Meads Depo 24:13-25:23 (Dkt. No. 41-1); McKenney Depo 49:13-50:4, 50:12-21, 51:4-16 (Dkt. No. 41-1).

**V.    August/September Voyage from Hawaii to Singapore**

In August 2016 the *Mississippi Voyager* set off from Hawaii to Singapore. McKenney Depo 44:10-45:7 (Dkt. No. 40-3). On August 23, 2016, Captain McKenney issued permits for inspection of four of the ballast tanks to be completed that day by 6:30 pm.[3] Baigi Depo 96:19-24 (Dkt. No.

---

[2] Chevron's Heat Illness Prevention Guide states "Planning Ahead and Work/Rest Cycles: A. Evaluate the vessel's trade route and anticipated climate to plan ahead for strenuous tasks to be performed in cooler climates when possible." See Chevron Heat Illness Prevent Guidance, ("Heat Illness Guide") Page 4, Exhibit "E" to Bull Declaration (Dkt. No. 41-1).

[3] Ultimately the tanks were inspected and cleaned over the course of two days. Baigi Depo

3

41-1); McKenney Depo 73:3-8, 92:9-94:12 (Dkt. No. 41-1).

After inspecting the first ballast tank, Mr. Baigi's concerns about the ballast tank project intensified. He went to Captain McKenney requesting help. Baigi Dec. ¶ 9 (Dkt. No. 41-2); Baigi Depo 101:3-10; 112:11 – 113:8; 154:15-25 (Dkt. No. 41-1). Citing the tight timeline and the number of ballast tanks that had to be inspected before the cleaning could begin, Mr. Baigi asked if the Second Mate could assist with inspecting so the two men could alternate and reduce the risk of overheating and overexertion. *Id.* Mr. Baigi split up the work crews who cleaned the ballast tanks so they could alternate: one crew would take a break while the other crew cleaned. *Id.* He wanted to employ this same strategy for himself during the inspections. *Id.* Mr. Baigi says Captain McKenney denied this request. *Id.* Captain McKenney does not recall Mr. Baigi asking him for assistance.[4] *Id.*; McKenney Depo 124:19-125:6 (Dkt. No. 41-1).

While Mr. Baigi took some precautions like drinking of water and trying to stay in the shade when possible, he did not take other actions like putting a wet towel around his neck or wetting down his clothes. Baigi Depo. 135:20-22; 136:8-20; 137:8-11; 137:19-21 (Dkt. No. 40-2). Mr. Baigi testified he did not wet himself down for fear of slipping when he was climbing up or down the ladders during the inspections. *Id.* Mr. Baigi maintains that he thought he would be fired if he refused to inspect the ballast tanks. Baigi Depo 57:11-58:2 (Dkt. No. 41-1).

With the inspection of each tank, the task became increasingly difficult. Baigi Depo 135:5-10 (Dkt. No. 40-2). In between inspections, Mr. Baigi was hauling hydraulic pipelines on deck because the hydraulic pipeline repair had not been completed prior to the *Mississippi Voyager*'s arrival in Hawaii. Baigi Depo 59:14-19; 60:8-24 (Dkt. No. 41-1).

Defendants argue Mr. Baigi was free to complete the inspections over the course of 5-6 days and that Mr. Baigi's injury was ultimately sustained due to his own poor choice to rush through a

---

178:4-11 (Dkt. No. 40-2).

[4] Mr. Baigi argues that when he asked Captain McKenney for help he was invoking a "Stop Work Authority" ("SWA"). Baigi Depo 196:21-197:12 (Dkt. No. 40-2). An SWA is a Chevron safety program that empowers every seagoing employee, irrespective of rank or experience, to stop a job if it is unsafe. McKenney Depo. 21:15-25(Dkt. No. 40-3). Captain McKenney testified during his deposition that while the SWA does not require any specific language, he does not equate asking for help as an invocation of an SWA. McKenney Depo 106:6-15; 142:13-25 (Dkt. No. 40-3).

4

taxing project. Dkt. No. 40 at 15 (Opening Brief). Mr. Baigi argues Captain McKenney wanted the ballast tanks inspected and cleaned "as soon as we left Hawaii" and before Mr. Baigi could get to the other projects on his list, he had to finish the ballast tank project. Baigi Declaration ¶¶ 5 and 6 (Dkt. No. 41-2). Mr. Baigi argues he felt pressure from Captain McKenney to finish quickly and that he was never told he had 5-6 days to complete the ballast tank project. *Id.* at 4.

On August 23, 2016, after inspecting four tanks on August 22 and an additional three on August 23, Mr. Baigi felt a sharp pain in his knee.[5] Baigi Depo 148:9-11; 187:4-22 (Dkt. No. 141-1); Baigi Depo 41:16 - 42: 1 (Dkt. No. 40-2). The pain and soreness did not abate and on the evening of August 23, 2016 the knee began to swell considerably. Baigi Depo 148:9-25 (Dkt. No. 40-2).

**LEGAL STANDARD**

**I.  Summary Judgement**

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case. *Id.* at 325.

Once the moving party has met its burden, the burden shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting then Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-

---

[5] Mr. Baigi's testimony regarding how many tanks he inspected is a bit murky. At one point he testified he inspected eight tanks but later corrected his testimony saying, "I would say [I inspected] seven." Baigi Depo 178:4-11 (Dkt. No. 40-2).

5

moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## II. Jones Act Negligence Claim

A Jones Act claim has four elements: (1) the employer's duty to provide a safe work environment to its seaman employee; (2) breach of that duty; (3) the employer's awareness of the unsafe condition; and (4) a causal link, however slight, between the breach and the seaman's injury. *Ribitzki v. Canmar Reading & Bates*, 111 F.3d 658, 662 (9th Cir. 1996). Further, "[t]he standard for causation in Jones Act claims is very low, and requires only that the negligence be a cause, however slight, of the injury." *Id.*

## III. Unseaworthiness Claim

To prevail on an unseaworthiness cause of action, "an injured seaman must prove that an unseaworthy condition proximately caused his injuries." *Faraola v. O'Neill*, 576 F.2d 1364, 1366 (9th Cir. 1978). An unseaworthiness claim has four elements: (1) seaman status triggering the warranty of seaworthiness; (2) an injury arising from the condition of the ship or its crew; (3) the unseaworthiness of that condition; and (4) proximate causation between the unseaworthy condition and the injury. *Ribitzki v. Canmar Reading & Bates*, 111 F.3d 658, 664 (9th Cir. 1997). Unseaworthiness demands a higher degree of causation than does a Jones Act negligence claim. *Id.* Unseaworthiness is a fact specific inquiry that can arise from "any number of circumstances, including an insufficient number of men assigned to perform a shipboard task, or the existence of a defective condition, however temporary, on a physical part of the ship." *Id.*

## IV. Primary Duty Rule

The Primary Duty Rule bars seaman-employees from recovering for injuries caused by their own failure to perform a duty imposed by employment. *California Home Brands, Inc. v. Ferreira*, 871 F.2d 830, 836 (9th Cir. 1989). The "result turns really not upon any question of 'proximate cause,' 'assumption of risk' or 'contributory negligence,' but rather upon the employer's independent right to recover against the employee for the non-performance of a duty resulting in

damage to the employer, which in effect offsets the employee's right to recover against the employer for failure to provide a safe place to work." *Bernard v. Maersk Lines*, 22 F.3d 903, 905 (9th Cir. 1994).

The Ninth Circuit has defined three limitations on the application of the Primary Duty Rule. *Id*. at 907. First, the Primary Duty Rule will not bar a plaintiff's claim of injury if the plaintiff did not consciously assume the duty as a term of his employment. For example, in *Bernard v. Maersk Lines*, the Ninth Circuit held that a seaman working as chief cook was not barred by the Primary Duty Rule where military crew members formed a human conveyor belt to help store an unusually large food shipment and he complained that they were handing him boxes more quickly than he could store them. *Id*. at 904. The chief cook had not, the court concluded, consciously assumed a duty to work under unsafe conditions. *Id*. "Second, the rule does not apply where a seaman is injured by a dangerous condition that he did not create and, in the proper exercise of his employment duties, could not have controlled or eliminated." *Id*. at 907. "Third, the rule applies only to a *knowing* violation of a duty consciously assumed as a term of employment." *Id* (emphasis added).

## DISCUSSION

Defendants argue that (1) plaintiff consciously assumed responsibility for the safety of the ballast tank cleaning operation; (2) plaintiff created and controlled the dangerous condition by completing the task too quickly; and (3) plaintiff knowingly violated his primary duty to ensure the ballast tank inspections were done safely. Dkt. No. 40 pages 14-15. Defendants bolster these three conclusions with essentially the same arguments for each:

- Mr. Baigi knew climbing ladders in heat was a hazard for the ballast tank inspections;
- Mr. Baigi was trained in Heat Illness Prevention techniques. Techniques were utilized for the cleaning crew that were not used by Mr. Baigi for the inspections;
- Mr. Baigi did not properly invoke a SWA when he asked for help;
- Mr. Baigi had 5-7 days during which to complete the ballast tank project but he rushed it in two days.

*Id*.

7

Mr. Baigi has raised disputed material facts that pierce defendants' arguments for purposes of summary judgment. First, there is a disputed material fact as to whether it was reasonable to ask Mr. Baigi to climb that many stairs, in 120 degree heat, without the help he asked for, while he was completing other physical and taxing work, when Mr. Baigi has testified that he thought he would be fired should he refuse to do so.

Second, material disputed facts exist as to whether Mr. Baigi failed to implement heat illness prevention techniques that could have helped to prevent his injury. Defendants argue that by failing to implement strategies he used for his cleaning crew, Mr. Baigi created the unsafe condition that led to his injury. Dkt. No. 42 at 12. Mr. Baigi draws distinctions between protocol he used for his crew, who spent an hour or more in the ballast tanks for the cleaning, versus his inspections that lasted approximately 10 minutes each. Baigi Declaration ¶10 (Dkt. No. 41-2); Baigi Depo 135:20-22; 136:8-20; 137:8-21 (Dkt. No. 40-2). For example, wetting himself down, Mr. Baigi argues, could have actually been unsafe – increasing his chances of slipping on the ladders. *Id*.

Third, material disputed facts exist as to whether Mr. Baigi invoked an SWA, specifically whether asking for help constitutes an SWA. This is significant because if Mr. Baigi did invoke an SWA, the work should have been stopped and the unsafe condition dealt with before moving forward. Captain McKenney stated in his deposition that though an SWA does not require specific language, he does not equate asking for help with an invocation of an SWA. McKenney Depo 106:6-15; 142:13-25. Mr. Baigi maintains his request for help constituted an SWA. Baigi Depo 196:21-197:12 (Dkt. No. 40-2).

Fourth, material disputed facts exist as to whether Mr. Baigi unilaterally made the decision to complete the ballast tank project in two days, thus, according to defendants, being solely responsible for creating the unsafe condition. Defendants argue Mr. Baigi independently set the unreasonable inspection schedule that resulted in his injury – they argue he had 5-7 days to complete the job. Dkt. No. 42 at 12. While Mr. Baigi admits that Captain McKenney never explicitly told him the job had to be completed in two days, Mr. Baigi alleges he understood from Captain McKenney's questions, demeanor, and conduct that they were behind schedule and the project needed to be done as soon as possible. Baigi Declaration ¶ 4 (Dkt. No. 41-2); Baigi Depo 181:2-24

8

(Dkt. No. 40-2). In his declaration, Mr. Baigi states that Mr. McKenney "was very adamant that [they] were behind schedule, and that the ballast tanks and Hydraulic pipe lines had to be done as soon as we left Hawaii." Baigi Decl. ¶4 (Dkt. No. 41-2). Further, Mr. Baigi has put forth evidence indicating that because of the amount of work that had to be done on such a tight schedule, he did not actually have 5-7 days. Baigi Depo 60:8-24; 181:2-24 (Dkt. No. 40-2).

Plaintiff's evidence creates material issues of fact regarding whether his case – like the plaintiff in *Bernard* – is an instance where he did not consciously assume a duty. Likewise, there are issues of fact as to who created and controlled the dangerous conditions that led to Mr. Baigi's injuries. Finally, there are material issues of fact regarding whether Mr. Baigi knowingly violated a duty. As such, it would be inappropriate to grant partial summary judgment with respect to the Primary Duty Rule.

## CONCLUSION

Considering the facts above, the Court finds there are substantial issues of material fact which preclude entry of summary judgment. The Court therefore DENIES defendants' motion for partial summary judgment.

**IT IS SO ORDERED**.

Dated: March 19, 2019

_____
SUSAN ILLSTON
United States District Judge

9